THIS OPINION IS
A PRECEDENT
OF THE T.T.A.B.

Mailed:
February 16, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Corporacion Habanos, S.A.

v.

Guantanamera Cigars Company

_____

Opposition No. 91152248 to application
Serial No. 76256068 filed on May 14, 2001

_____

David B. Goldstein of Rabinowitz, Boudin, Standard, Krinsky
& Lieberman, P.C. for Corporacion Habanos, S.A.

Frank Herrera of Frank Herrera, P.A. for Guantanamera Cigars
Company.

_____

Before Zervas, Cataldo and Bergsman, Administrative
Trademark Judges.[1]

Opinion by Zervas, Administrative Trademark Judge:

### *Background*

Corporacion Habanos, S.A. ("opposer") has opposed the

registration on the Principal Register of the mark

GUANTANAMERA (in standard character form) for "tobacco,

---

[1] Judge Hairston, who was a member of the Board's panel that
rendered the February 29, 2008 opinion (see below), has retired.
Judge Bergsman is substituted for Judge Hairston.

namely, cigars" by Guantanamera Cigars Company

("applicant").  On February 29, 2008, after trial on the

merits, we sustained opposer's opposition on the ground that

applicant's mark is primarily geographically deceptively

misdescriptive under Trademark Act §2(e)(3).[2]

See *Corporacion Habanos S.A. v. Guantanamera Cigars Co*., 86

USPQ2d 1473 (TTAB 2008).  Applicant appealed our decision to

the District Court for the District of Columbia, and, on

August 5, 2010, the district court remanded the case back to

the Board.  *Guantanamera Cigars Co. v. Corporacion Habanos,*

*S.A.*, 729 F.Supp.2d 246, 98 USPQ2d 1078 (D.D.C. 2010).

In our 2008 decision, we applied the three-part test

set forth by the Federal Circuit in *In re California*

*Innovations, Inc*., 329 F.3d 1334, 66 USPQ2d 1853, 1856-57

(Fed. Cir. 2003), for determining whether a mark is

primarily geographically deceptively misdescriptive, namely,

whether:

> (a) the primary significance of the mark is a
> generally known geographic location;

> (b) the consuming public is likely to believe the
> place identified by the mark indicates the origin
> of the goods bearing the mark (i.e., that a goods-
> place association exists), when in fact the goods
> do not come from that place; and

> (c) the misrepresentation would be a material
> factor in the consumer's decision to purchase the
> goods.

---

[2] We did not reach opposer's claim of fraud stemming from applicant's representation to the Office that GUANTANAMERA has no meaning or English translation.

2

The district court also applied the *California Innovations* test in its decision, and found as follows in relevant part:

- "Guantanamera literally means 'girl from Guantanamo'";

- applicant did not produce sufficient evidence to disturb the Board's finding that the primary significance of GUANTANAMERA is a geographic location;

- the consuming public is likely to believe that applicant's cigars originate from Cuba;

- the record "contains ample evidence that cigar tobacco is produced in the Guantanamo province"; and

- "Cuba is well-known for cigars."

*Guantanamera,* 98 USPQ2d at 1082-83. The district court, because it did not comment on or disagree with our finding that applicant's goods do not come from Cuba, apparently agreed with such finding. However, the court did <u>not</u> agree with our conclusion on the third element of the *California Innovations* test — the materiality of the geographic misrepresentation inherent in the mark. The court concluded that our decision did not address whether a significant portion of relevant consumers would be materially influenced in their purchasing decisions; and "[t]o establish a *prima facie* case, the TTAB or the opposition must show that 'a significant portion of the relevant consumers would be materially influenced in the decision to purchase the product or service by the geographic meaning of the mark.'" The court cited to *In re Spirits Int'l*, 563 F.3d 1347,

3

90 USPQ2d 1489, 1495 (Fed. Cir. 2009), which the Court of Appeals for the Federal Circuit decided after we issued our decision in *Corporacion Habanos*.[3]

The district court added that opposer "never introduced evidence that suggested material deception of a substantial proportion of the relevant consuming public"; and "never established a *prima facie* case for the third part of the test before the TTAB." *Guantanamera*, 98 USPQ2d at 1084. The district court remanded the case "to the TTAB so it may apply the proper legal standard to the third part of the test for primarily geographically deceptively misdescriptive terms." *Id*. at 1085.

On September 28, 2010, the Board reopened proceedings for the limited purpose of having the parties address the question on remand, namely, whether a significant portion of the relevant consumers would be materially influenced in the

---

[3] In our 2008 opinion, we stated the following regarding the materiality element of the *California Innovations* test:

> The final prong of the three-part test requires proof that the misleading goods-place association is a material factor in the customer's decision to purchase applicant's cigars. Because opposer has established Cuba's renown and reputation for high-quality cigars … we find that the goods-place association created by applicant's mark with Cuba is material in a consumer's decision to purchase applicant's cigars. Applicant evidently believed that the use of Cuban tobacco is a material factor in the decision to purchase a cigar because it included the false claim "Genuine Cuban Tobacco" on its product packaging. Accordingly, we find that the third element of the Section 2(e)(3) test has been met.

decision to purchase the product or service by the geographic meaning of the mark. The Board also reopened the briefing period, and allowed the parties to file briefs limited to this question.

### *The Evidentiary Record*

The parties took further discovery and fully briefed the issue on remand. The record now includes, in addition to the evidence noted in our February 29, 2008 decision, the following:

- the parties' stipulation (TTABVUE no. 118),[4] allowing for, *inter alia*, the introduction into evidence of the depositions or excerpts of the discovery depositions taken in the district court action of (i) Encarnacion Santovenia (vice president of Tabacuba and former national director of tobacco agriculture in Cuba), (ii) Mauricio Hanono (owner of Absolute Cigar Shop, a cigar retailer), (iii) Enrique Berger (owner of Cuban Crafters, another cigar retailer) and (iv) Jorge Armenteros (a tobacco retailer and educator who applicant offered as applicant's expert witness); and Mr. Santovenia's declaration in support of opposer's summary judgment motion submitted in the district court action;

- opposer's supplemental notice of reliance including excerpts of the depositions of Messrs. Santovenia, Hanono, Berger and Armenteros taken in the district court action (TTABVUE nos. 121 – 124);

- exhibits to the trial testimony of opposer's witness Jose L. Montagne, president of applicant (TTABVUE no. 125), previously submitted at TTABVUE no. 75;

---

*Corporacion Habanos*, 86 USPQ2d at 1479.

[4] TTABVUE refers to the "Trademark Trial and Appeal Board Inquiry System," which is the electronic record for Board proceedings.

- the expert trial testimony, with exhibits, of opposer's witness Alvin Ossip, including the Ossip expert report and the Ossip supplemental expert report (TTABVUE nos. 145, 149 and 151);

- applicant's supplemental notice of reliance (TTABVUE nos. 130 – 144, 146, 152 – 166); and

- opposer's supplemental rebuttal notice of reliance (TTABVUE nos. 168 and 169).[5]

The above evidence on the <u>single</u> issue which was the subject of the remand amounts to approximately three-thousand pages. In our view, this case is yet another in a series of cases before the Board in which the issue does not warrant a record of this size. See *General Mills Inc. v. Fage Dairy Processing Indus. SA*, 100 USPQ2d 1584, 1591 (TTAB 2011) ("… the issues herein do not warrant a record of this size. This is not the first time the Board has expressed its displeasure about overzealous litigation in our proceedings.")

*Evidentiary Matters/Opposer's Evidentiary Objections*

Opposer submitted as exhibit 1 to its main brief "[a] true and correct copy of the excerpts of the Armenteros [district court discovery] deposition and the deposition exhibits and excerpts thereof that are cited" in the brief. As indicated above, Mr. Armenteros is a tobacco retailer and educator. Applicant offered Mr. Armenteros as an expert witness in the district court; his deposition is covered by

---

[5] Applicant did not object to any of opposer's supplemental evidence.

the parties' stipulation regarding various depositions. Opposer introduced into the record certain excerpts from the Armenteros discovery deposition, some during opposer's trial period and others during its rebuttal period. However, after spending some time reviewing the submission, we discovered that approximately thirty pages in exhibit 1 were not submitted to the Board during the testimony period, and thus were never made of record. It appears to us that opposer sought to have us consider those pages in exhibit 1 - which were not in evidence - by burying them among other pages which were properly submitted in evidence in this purportedly handy attachment to its brief. We condemn in the strongest possible terms opposer's attempt to hoodwink us into considering material that opposer did not make of record, and which is helpful to opposer's case. Little is left in the integrity of a proceeding if the tribunal cannot trust the accuracy of submissions or the veracity of a party's representations. As for those pages in exhibit 1 which opposer properly introduced in evidence, it was not necessary to resubmit them with opposer's brief. The Board has repeatedly advised parties that it is not necessary to submit duplicates of material that is already in the record. Although the submission, with a brief, of one or two pages of particularly important material, along with clear and accurate notations of where in the record the material can

be found, can be useful, in general, the submission of large amounts of material as exhibits to briefs is not helpful.

Next, we turn to the documents submitted by applicant. Many of the documents submitted by applicant by notice of reliance are not appropriate for submission under the notice of reliance procedure. The parties stated in their stipulation that, with one exception that does not apply here, they waive any authentication objections to exhibits submitted in connection with the parties' cross-motions for summary judgment in the district court action, and that the exhibits "shall be submitted to the Board either by Notice of Reliance or with the relevant deposition testimony in which said exhibits were identified." (Stipulation at ¶ 2; TTABVUE no. 118.) The Board approved this stipulation in its order of January 6, 2011. (TTABVUE no. 119.) The parties did not specify which documents submitted by notice of reliance fall within the stipulation. Because opposer has not objected to the submission of any documents by applicant as being outside of the notice of reliance procedure, we have construed the stipulation as including all submitted documents, and we have not excluded those documents inappropriate for the notice of reliance procedure.

Opposer raises a hearsay objection to "[p]rintouts of the results of thirteen (13) on-line 'Weekly Polls' on the

*Cigar Aficionado* website … and a printout of a list of *Cigar Aficionado* online 'Weekly Polls' from 1997-2010." (Opposer's statement of evidentiary objections at 1; TTABVUE no. 135.) The pages from the magazine *Cigar Aficionado* include, in addition to articles on cigars, the results of informal surveys on topics such as consumer habits, practices and preferences regarding cigars.[6] Applicant submitted these results to show, *inter alia*, that "advertising has very little to do with a United States cigar consumer's decision to purchase cigars" and "that on-line surveys are a simple and cost effective way to illicit [sic] direct information from the United States cigar consuming public." (Applicant's supplemental notice of reliance at ¶ 11.) Because there is no information about how the surveys were conducted or how many persons participated in the surveys, or even if they were conducted scientifically in accordance with established survey practices, opposer's hearsay objection is sustained to the extent that it is directed to the results of the survey; we

---

[6] For example, the pages record the results obtained in response to the following questions:

> Q. Which country is your everyday cigar from?

> Q. What motivates you to try new cigar brands?

> Q. When you buy a box of Cuban cigars, does the Cuban code influence your buying habits?

(Applicant's supplemental notice of reliance; TTABVUE no. 149 at 9, 10 and 13.)

have not considered the survey results for the truth of any matter asserted therein. To the extent that applicant relies on the survey results to demonstrate that information could be obtained from the cigar consuming public through an on-line survey, we overrule opposer's competency and relevancy objections and have considered the materials from *Cigar Aficionado* for the limited probative value they have, i.e., that such a "poll" can be conducted. For the reasons stated above, the "poll" results are not probative of the only issue before us, namely, whether it is material to consumers that cigars come from Cuba.

Opposer's objections on the basis of relevancy to (i) the registration record for Registration No. 3377574 for GUANTANAMERA for, *inter alia*, rum and liquors; (ii) a webpage printout regarding the tobacco-growing regions of Cuba; and (iii) documents regarding an August 2009 cigar industry trade show, are all overruled. Although not directly relevant to the issues on remand, the evidence is harmless to opposer's case.

Opposer's objection to applicant's sales documents such as invoices and receipts (TTABVUE nos. 155 – 164) is overruled. Applicant offered these documents to show that opposer could have deposed the merchants or customers identified in the sales documents (and hence could have obtained direct evidence from consumers on whether the

alleged misrepresentation in the mark was a material factor in the decision to purchase the goods).[7]  According to opposer, applicant did not produce discovery relating to potential witnesses (i.e., cigar retailers or distributors) in the district court proceeding and was sanctioned; applicant hence should be precluded from relying on these documents in the Board proceeding because they relate to an issue on which the district court sanctioned applicant.  We are not persuaded that any behavior which resulted in a sanction in the district court proceeding should bar applicant's reliance on this evidence in this Board proceeding, as any estoppel sanction imposed by the court relates to conduct during the court proceeding.  For the estoppel sanction to be applied in this proceeding, opposer would have to establish that conduct in this proceeding warranted application of a sanction.

Opposer objected to the discovery deposition testimony of Messrs. Santovenia, Berger, Hanono, Armenteros, Manuel Garcia (identified by applicant as opposer's former vice-president) and Ossip[8] taken in the district court action,

---

[7] Applicant submitted sales documents pursuant to a notice of reliance.  Sales documents are not appropriate for submission by notice of reliance.  We construe the stipulation noted earlier in this decision to extend to these documents and thus have not excluded them as inappropriately submitted pursuant to a notice of reliance.

[8] Opposer submitted Mr. Ossip's February 15, 2011 entire deposition, thus applicant did not need to include this deposition as a part of its notice of reliance.  Once an item of

which applicant listed in its supplemental notice of reliance. However, applicant did not submit this material to the Board, and therefore the objection is moot. In addition, we give no effect to opposer's objection to applicant's stated reliance in paragraph 18 of applicant's supplemental notice of reliance on "any other document or testimony submitted in connection with the District Court Action and not otherwise cited to." To the extent applicant seeks to rely on documents or transcripts of testimony attached to its notice of reliance but not referenced in such notice, the documents or transcripts have not been properly introduced; and opposer did not identify any documents or transcripts which fall within the description of paragraph 18, so there do not appear to be any particular documents or transcripts which we need to exclude.

As for opposer's objection to the pages bearing the Internet address www.cigarcyclopedia.com (see TTABVUE no. 143) on the basis that the pages were not identified in the supplemental notice of reliance and applicant did not indicate the relevance of these documents, opposer's objection is overruled. Opposer raised the objection – which is a procedural objection under Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e) - for the first time in

---

evidence has been introduced into the record, it may be relied on by any party for any purpose.

12

opposer's statement of objections filed concurrently with opposer's brief.  Opposer failed to seasonably raise its objection at a time that applicant would have had an opportunity to cure the alleged deficiency.  See Trademark Board Manual of Procedure ("TBMP") §§ 532 and 707.02 (3d ed. 2011).[9]

Opposer's objection to an online article from *The Economist* (TTABVUE no. 171) is sustained.  Applicant proffered the article well after its testimony period closed and did not move to reopen the trial period.  See 37 C.F.R. § 2.121(b)(1); TBMP § 703.01(c).  Additionally, we have not considered exhibit A to applicant's brief for the same reason.

### *Expert Qualifications and Expert Reports*

Opposer objected to the expert report of Mr. Armenteros, applicant's proffered expert, on the ground that it is not competent expert testimony pursuant to Fed. R. Evid. 702, and *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).  According to Mr. Armenteros, he offered his expertise on (i) the "advertising and selling of Cuban [cigar] brands in America" by the U.S. cigar industry, and (ii) "consumer perception of

---

[9] The probative value of this evidence to the issue *sub judice* is extremely limited.

13

… the Guantanamera brand in connection with cigars."
(Armenteros dep. at 75 – 76; TTABVUE no. 168 at 91 – 96.)

Mr. Armenteros is the owner of ALTOC, Inc., d/b/a "A Little Taste of Cuba," a retail tobacconist company that specializes in premium and luxury cigars. He has been involved in retail cigar and tobacco sales since 1995, working with inexperienced smokers as well as connoisseurs. Since 2005, Mr. Armenteros has been developing Tobacconist University, LLC ("TU"). "TU is an educational institution dedicated to researching, learning, and teaching the history and traditions of the premium/luxury tobacco industry while building and projecting the industry's credibility. TU provides free education and information" on its website.[10] (Armenteros curriculum vitae; TTABVUE no. 133 at 10.) Mr. Armenteros also writes a blog, and regularly reads approximately ten cigar industry magazines and reviews ten cigar-related websites. (Armenteros dep. at 109, TTABVUE no. 123 at 92; and appendix I and II to Armenteros written report, TTABVUE no. 133).

With regard to his exposure to applicant's goods, he received one box of twenty-five GUANTANAMERA cigars in 2007, and stated in his curriculum vitae when describing his experience with GUANTANAMERA cigars, "I tried the cigars and

---

[10] As of June 2009, TU had 190 certified and apprenticing tobacconists in three countries; there is no indication how many

14

do not remember it being compelling enough to buy and sell in my stores." (TTABVUE no. 133 at 10.) He does not sell GUANTANAMERA cigars in his stores, does not know who buys them, where they are sold or how many are sold. (Armenteros dep. at 113-14, TTABVUE no. 168 at 93-94.)

Mr. Armenteros received a bachelor's degree in International Business and Marketing in 1995 from The American University in Washington, D.C. (Armenteros dep. at 117, TTABVUE no. 168 at 117.) He has Cuban ancestry, has traveled in Cuba and speaks Spanish.

Fed. R. Evid. 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The court (or the Board, in this case) acts as a "gatekeeper" and determines the admissibility of expert testimony and the qualifications of expert witnesses, *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n. 9 (D.C. Cir. 2001) (quoting *Daubert*, 509 U.S. at 592 n. 10); and has "broad discretion in determining whether to admit or exclude

---

of such tobacconists and apprentices are in the United States. (Armenteros curriculum vitae; TTABVUE no. 133 at 10.)

expert testimony." *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc*., 608 F.3d 871, 895 (D.C. Cir. 2010). The trial court's gatekeeping obligation applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In *Khairkhwa v. Obama*, 793 F.Supp.2d 1, 10-11 (D.D.C. 2011), the court explained:

> Rule 702 does not specify any particular means for qualifying an expert, requiring only that the witness possess the "knowledge, skill, experience, training, or education" necessary to "assist" the trier of fact. Fed. R. Evid. 702. As the Supreme Court stated in *Daubert* the trial court must determine whether the proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592, 113 S.Ct. 2786. In considering whether this standard is met, courts may consider the factors articulated in *Daubert,* such as (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.*
>
> The Supreme Court has, however, noted that the *Daubert* factors are not exclusive and may not apply in all cases. *Kumho Tire Co.,* 526 U.S. at 150-51, 119 S.Ct. 1167 (noting that Rule 702 envisions a "flexible" inquiry). In cases in which the *Daubert* factors do not apply, "reliability concerns may focus on personal knowledge or experience." *Groobert v. President & Dirs. of Georgetown Coll.,* 219 F.Supp.2d 1, 6 (D.D.C. 2002) (citing *Kumho Tire Co.,* 526 U.S. at 149, 119 S.Ct. 1167). …
>
> There is, however, no requirement that an expert possess formal education, and an expert may be

> qualified on the basis of his or her practical experience. *See, e.g., Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269-70 (9th Cir. 1994) (concluding that a longshoreman with twenty-nine years of experience in various positions within the industry was qualified to testify as an expert about proper safety procedures). As noted in the advisory committee notes to Rule 702, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."

Expert testimony that is based upon "subjective belief" or "unsupported speculation" is excluded. *Harris v. Koenig*, __ F.Supp.2d __, 2011 WL 2531257, at *1, (D.D.C. June 27, 2011) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996)). The court must focus its analysis on the reliability and relevance of the proffered expert testimony. *Id*. at 133.

We first consider whether Mr. Armenteros qualifies as an expert in the advertising and selling of Cuban cigar brands, i.e., cigar brands with Cuban names or words or references to Cuba, in the United States. We find that in view of the many years he has owned and operated two tobacco stores that have sold a variety of cigars over the years, his interactions with sellers and buyers of cigars, his regular review of cigar magazines and websites, his travels to cigar manufacturing regions in the world, his operation of TU and its predecessor, and his writings on his cigar-related blog, he has sufficient expertise to testify as to

17

the advertising and selling of Cuban cigar brands in the United States. As noted above, the district court has allowed expert testimony by witnesses based on personal experience. See *Groobert*, 219 F.Supp.2d at 6 ("personal experience is therefore a reliable basis for his expert testimony ….").

Because we have found that Mr. Armenteros is qualified as an expert on the advertising and selling of Cuban cigar brands in the United States, we turn to his expert report and opposer's objections thereto. Specifically, we consider whether his testimony set forth in his expert report is reliable. "[E]xpert testimony [is] unreliable when an expert chooses to utilize her own unique methodology rather than the proper analysis which is well-known and respected." *Groobert,* 219 F.Supp.2d at 8, citing *Kumho Tire Co*., 526 U.S. at 157, *Meister*, 267 F.3d at 1131, and *Raynor v. Merrel Pharm. Inc*., 104 F.3d 1371, 1375-76 (D.C. Cir. 1977). The testimony should not be based on speculation. *U.S. v. Simmons*, 431 F.Supp.2d 38, 75 (D.D.C. 2006).

Mr. Armenteros reached the following conclusions at pp. 5 – 6 in his report (TTABVUE no. 133 at 6 – 7):[11]

---

[11] Mr. Armenteros's report was submitted to the district court in connection with the cross motions for summary judgment in that proceeding, which resulted in the remand to this Board. The district court did not opine on the qualifications of Mr. Armenteros as an expert, on the admissibility of his report or on the evident lack of methodology in reaching his conclusions.

I do not believe that the word Guantanamera is generally believed to be a reference to a geographic location. Rather, I believe that the primary significance of the word "Guantanamera" among U.S. cigar consumers is that "Guantanamera" is a famous song of Cuban origin. Those that do relate Guantanamera to Cuba perceive it as a cultural reference. With regard to those people that may relate the word Guantanamera to Guantanamo, Cuba, there is no perceived or significant historical connection between cigars and Guantanamo or Guantanamera. Today's consumers are used to the use of Spanish words in cigar marketing and do not associate such use as indicating the geographic source of the products as originating from Cuba. Rather, they understand that premium cigars have evolved from Cuba and it is common to reference Spanish language and Cuban culture. Hence, any use of the word Guantanamera would not lead consumers to believe that the cigars come from Guantanamo or Cuba. Even if a person did believe that the Plaintiff's Guantanamera cigars came from Guantanamo, Cuba, this would not be a material factor in their decision to purchase the cigars.[12]

We do not discern any methodology applied by Mr. Armenteros in arriving at his conclusions, and applicant has not indicated one. Mr. Armenteros testified that he did not undertake any studies or focus groups in arriving at his conclusions. (Armenteros dep. at 116, TTABVUE no. 168 at 95.) The following is telling as to how he arrived at his conclusions:

Q. Did you rely on any written materials for the statement in here that educated consumers are driving much of the innovation in the marketplace?

---

[12] Many of Mr. Armenteros's opinions in the quoted paragraph are contrary to the findings of the district court; those findings cannot be revisited because the district court's findings are binding on us on remand. We include Mr. Armenteros's opinions herein to explain why he reached his conclusion that the geographic location referenced in the mark is not material to the purchaser.

19

A.  No.  An educated perception.

Q.  That you have an educated perception?

A.  I do.

(Armenteros dep. at 144; TTABVUE no. 168 at 101.)  Even assuming that conversations with customers and other tobacconists over an unspecified time period constitute a "technique" under *Daubert*, opposer correctly notes at p. 14 of its brief that there is no evidence to show that there are any standards which he applied to his technique or that the technique is generally accepted by the marketing or advertising community.  Thus, to the extent that Mr. Armenteros's report concerns the "advertising and selling of Cuban [cigar] brands in America," opposer's objection is sustained; there is nothing in the report or his testimony to demonstrate that the report is reliable.

We turn now to the question of whether Mr. Armenteros is qualified to provide expert testimony on consumer perceptions of the GUANTANAMERA brand in connection with cigars.  Mr. Armenteros acknowledged in his deposition that he is not an expert on applicant's GUANTANAMERA cigars in the United States.  (Armenteros dep. at 144; TTABVUE no. 168 at 144.)  He testified that his only exposure to applicant's cigars was from one box of twenty-five samples that he received from applicant in 2007, which he did not sell, but rather gave away.  (Armenteros dep. at 116–17; TTABVUE no.

168 at 95-96.) He also stated that he does not know (i) who buys such cigars, (ii) the income, education or sophistication level of the typical consumer of such cigars; (iii) how the profile of his consumers compares to that of a GUANTANAMERA cigar consumer; (iv) how the GUANTANAMERA consumer profile compares to that of other premium cigar consumers; (v) where GUANTANAMERA cigars are sold; (vi) how many are sold; (vii) the percentage that are sold by retail stores, internet or mail order; (viii) its sales ranking among cigar brands; or (ix) when they were first sold. (Armenteros dep. at 113-114, 119, 123 and 144-145; TTABVUE no. 168 at 92-93, 97, 98 and 101-102.) He clearly is not qualified as an expert on the GUANTANAMERA brand of cigar through direct knowledge or contact with the brand. However, we do not require an expert witness to have direct knowledge or expertise of a particular brand in order provide expert testimony related to the brand. To require such knowledge or expertise would be far too onerous on a party in a Board proceeding, especially a party that does not have a product that is widely sold or known to a wide segment of the population. In many cases, a party would not be able to locate such an expert. Rather, as an *extension* of his qualification to provide expert testimony on the advertising and selling of Cuban cigar brands in the United States by the U.S. cigar industry, we find that Mr.

21

Armenteros is qualified to provide expert testimony on the likely perception of cigar consumers of the GUANTANAMERA brand. The problem, of course, is the lack of methodology reflected in his written report. Thus, we sustain opposer's objection to Mr. Armenteros's written report to the extent that it concerns consumer perceptions of the GUANTANAMERA brand in connection with cigars.

We have considered Mr. Armenteros's non-opinion *deposition* testimony, including his statements at p. 157 of his deposition (TTABVUE no. 123 at 107) regarding attempts by cigar manufacturers to associate their products with Cuba, and discuss his testimony later in this opinion.

With regard to opposer's expert, Mr. Ossip, and his two expert reports, because applicant has not raised any objection to Mr. Ossip's qualifications and reports, we find Mr. Ossip qualified to provide expert testimony on the subjects on which he has testified, both in his deposition and in his reports.

## *Analysis*

We now turn to the question on remand, namely, whether a significant portion of the relevant consumers would be materially influenced in the decision to purchase the cigars by the geographic meaning of the mark.[13] We begin, of

---

[13] Regarding materiality in purchasing decisions, opposer's expert, Mr. Ossip, explained:

course, with the Federal Circuit's decision in *Spirits* which led to this remand, where the Federal Circuit reversed the Board's finding that MOSKOVSKAYA, translated as "from Moscow," was geographically deceptively misdescriptive of vodka. The Board found that Moscow was noted for vodka, and that Russian speakers who would translate the mark as "from Moscow" would be deceived into believing that the vodka came from Moscow. The Court stated, "in order to establish a *prima facie* case of materiality there must be some indication that a substantial portion of the relevant consumers would be materially influenced in the decision to purchase the product or service by the geographic meaning of the mark." *Spirits,* 90 USPQ2d at 1495. The Court noted in reversing the Board's decision that the Board failed to consider whether Russian speakers were a "substantial portion of the intended audience." In this regard, the Court commented:

> We express no opinion on the ultimate question of whether a substantial portion of the intended audience would be materially deceived. We note

In marketing terminology "materially influenced" could logically and operationally be defined as a reason that is important enough to have had an effect in the choice of purchasing the brand (that is, the mark) as opposed to purchasing any other brand. To be material the reason (such as mistaken goods-place association) need not have been the sole motivator for the purchase or even the most important one. However, it would have played a role in the consumer's reasoning that led to the purchase of that brand versus any other. (Ossip supplemental expert report at 9; TTABVUE no. 145 at 10.)

23

that only 0.25% of the U.S. population speaks Russian. … If only one quarter of one percent of the relevant consumers was deceived, this would not be, by any measure, a substantial portion. However, it may be that Russian speakers are a greater percentage of the vodka-consuming public; that some number of non-Russian speakers would understand the mark to suggest that the vodka came from Moscow; and that these groups would together be a substantial portion of the intended audience.

Because the mark in issue in this case is a Spanish term, we must consider in connection with the question of materiality, at a minimum, whether Spanish speakers in the United States are a substantial portion of the intended audience (or purchasers) for applicant's goods, and, if so, whether they would be materially influenced in the decision to purchase applicant's goods by the geographic meaning of the mark. *Accord In re Jonathan Drew*, 97 USPQ2d 1640, 1646 n.14 (TTAB 2011) ("we read *Spirits* as requiring a showing that a substantial portion of the relevant universe of consumers (however that universe is defined), would recognize the meaning of a foreign language term as denoting a geographic place.") As part of this determination, we also consider the nature and type of evidence that is acceptable to establish materiality.

*Are persons who speak Spanish a substantial portion of the intended audience?*

The record includes data from the 2007 U.S. census showing that almost 35 million people in the United States

24

over age five (12.3% of the population of the United States) speak Spanish at home; and that in Florida, 3.3 million people (19.3 percent of Florida's population) speak Spanish at home. (Opposer's supplemental notice of reliance, exhs. 8 and 9; TTABVUE no. 124 at 86-112.) Tens of millions more people in the United States have received Spanish language instruction in school. See, e.g., federally-funded studies in 1997, 2000 and 2008, showing over five million public school students studying Spanish in 2000 and in 2008, and 70% of students studying a foreign language were taking Spanish. (Opposer's supplemental notice of reliance, exhs. 10 and 11; TTABVUE no. 124 at 113-154.) Opposer hence has established that (i) persons who speak Spanish at home, and (ii) persons who do not speak Spanish at home but who know Spanish, are a substantial portion of the U.S. population.

The record also reflects that all of applicant's advertisements prior to 2008 were in Spanish; and at least as of December 2006, applicant's website was almost exclusively in Spanish and many of applicant's customers are from Cuba (and presumably know Spanish, since that is the primary language of Cuba). (Montagne dep. at 65, 69, 76, 90, 103 and 104, TTABVUE no. 75 at 19, 20, 22, 56-27 and 29; Montagne exhs. 1, 5 and 6, TTABVUE no. 125 at 10, 33, and 39-77.)

In view of the foregoing, and because applicant's goods are directed to the general adult population, we may infer that Spanish-speaking adults purchase cigars generally and applicant's cigars in particular. Therefore, we find that persons who speak or know Spanish are a substantial portion of the intended audience (or purchasers) of applicant's goods.

*Must opposer rely only on direct evidence on the question of materiality?*

Applicant argues that opposer may only rely on direct evidence of materiality. Brief at 3. As acceptable direct evidence, applicant proposes (a) a survey of the cigar consuming public on the question of materiality; and/or (b) direct testimony from cigar retailers or cigar consumers, including applicant's customers. Brief at 5 - 7. According to applicant, an inference of deception is not enough to establish deceptiveness. Brief at 12 ("… if there is an inference of deception based on the likelihood of a goods/place association (or a claim that Cuba is famous for cigars), a mere inference is not enough to establish the deceptiveness and consequence of non-registrability.")

In *Spirits*, the Federal Circuit did not provide any guidance on the nature of evidence needed to establish materiality, and the district court did not comment on what evidence it considers appropriate for our consideration. Thus, in assessing the merits of applicant's argument, we

26

consider (i) what evidence the Federal Circuit has allowed in *ex parte* cases on the question of materiality, (ii) what evidence other courts have allowed in infringement cases, and (iii) the merits of requiring direct evidence.

In *In re Les Halles de Paris, J.V.*, 334 F.3d 1371, 67 USPQ2d 1539, 1542 (Fed. Cir. 2003), the Federal Circuit allowed that for goods, the Office may inferentially establish materiality. Additionally, in *Spirits*, the Federal Circuit "did not say or suggest that the evidence must show that a substantial portion of the relevant public would actually be deceived, or that indirect evidence of consumer perception of the mark … would not be sufficient." *Jonathan Drew*, 96 USPQ2d at 1645. Thus, at least in the *ex parte* context, indirect evidence is permitted, and materiality may be established by inference.

The Board too has allowed inferences of materiality in *ex parte* cases. In *Jonathan Drew*, the Board did not require direct evidence of materiality and stated as follows in discussing the examining attorney's evidentiary burden in light of *Spirits* and *California Innovations*;

> [T]o the extent that applicant is arguing that evidence allowing the Board to draw an inference of materiality is not sufficient and that direct evidence of public deception is required, we do not agree. It is well settled that evidence of what the relevant public understands a term to mean may be shown not only by direct evidence, such as consumer testimony and surveys, but it may also be inferred from indirect or circumstantial evidence, such as gazetteer entries and third-

27

> party websites, as we have in this case. See *In re Merrill Lynch, Pierce, Fenner and Smith Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987). See also *Bayer*, [*In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1832 (Fed. Cir. 2007)](online sources are probative of how a term would be perceived); *In re Reed Elsevier Properties Inc.*, 482 F.3d 1376, 82 USPQ2d 1378, 1381 (Fed. Cir. 2007) ("third-party websites are competent sources to show what the relevant public would understand a term to mean").
>
> Further, we do not read the Court's decision in *Spirits* as departing from the Court's longstanding precedent which has permitted inferences of materiality to be drawn from the evidence, and serving as proof that a substantial portion of the relevant public will be deceived.

*Jonathan Drew*, 97 USPQ2d at 1645.

At least one federal court has also accepted indirect evidence of materiality involving a Section 2(e)(3) claim. In *Daesang Corp. v. Rhee Bros. Inc.*, 77 USPQ2d 1753, 1763 (D. Md. 2005), the Maryland district court considered the trademark SOON CHANG for a popular Korean hot bean paste product known as "gochujang." Soon Chang is a geographical region in Korea. In finding for the plaintiff on the question of materiality, the court relied on the admission of defendant's principal, expert testimony, and the defendant's advertisements and packaging referencing the geographic location.

As for applicant's contention regarding conducting a survey for actual evidence of materiality, including an on-line survey, the Board does not require surveys to establish

28

facts in any Board proceeding.[14]  Although surveys may be helpful in certain instances, they are not required of litigants at the Board given the limited nature of our jurisdiction.  *Schering-Plough HealthCare Prods., Inc. v. Ing-Jing Huang*, 84 USPQ2d 1323, 1328 (TTAB 2007) ("… the Board does not require surveys in Board proceedings.").

Applicant also argues that opposer could have deposed or questioned some of applicant's actual purchasers to determine whether the geographic significance of the mark was a material factor in their decision to purchase applicant's cigars.  The purchasing decisions of applicant's actual purchasers are not critical in determining the issue of materiality.  What is important is the materiality of the misrepresentation in the mark to the intended group of cigar purchasers in this case, which, as we noted *supra*, contains a substantial proportion of Spanish speakers.  Additionally,

---

[14] The Federal Circuit recognized in "*ex parte* prosecution … the PTO has limited facilities for acquiring evidence — it cannot, for example, be expected to conduct a survey of the marketplace or obtain consumer affidavits …."  *In re Budge Mfg., Inc*., 857 F.2d 773, 8 USPQ2d 1259, 1260-61 (Fed. Cir. 1988).   In *In re Loew's Theatres, Inc*., 769 F.2d 764, 226 USPQ 865 (Fed. Cir. 1985), an *ex parte* appeal involving a Section 2(e)(3) refusal, the Federal Circuit stated that the USPTO, as part of its *prima facie* case, "does not have means" to undertake the research, such as a marketing survey, necessary to prove that the public would actually make the goods/place association asserted; and required the USPTO only to establish "a reasonable predicate for its conclusion that the public would be likely to make the particular goods/place association on which it relies," and not that the public would actually make the asserted association.  *Id*. at 868. Applicant has pointed to no authority that indicates surveys, not being necessary in ex parte consideration of Section 2(e)(3), would be necessary in inter partes cases.

Mr. Ossip noted the following difficulties in obtaining testimony from actual purchasers:

> [I]t is difficult to locate and question buyers very close to the time they made their initial purchase (and perhaps before they discover the geographic misdescription and would be loath to admitting they were fooled.)  Even if some buyers were found, a serious question arises as to whether the sample of buyers who were questioned would enable one to extrapolate results to the larger population of the brands' buyers.

(Ossip supplemental expert report at 10; TTABVUE no. 145 at 11.)  We point out too that if a product has insubstantial sales and hence few actual purchasers, the burden on a plaintiff to locate actual purchasers who recall their reasons for making a purchase is too great.

At this point in our decision, we pause to comment on one point raised by the district court in the present case which may be construed as changing the evidentiary standard in any case involving a Section 2(e)(3) refusal at the Board.  The district court stated, *Spirits* "plainly demands more than a finding of Cuba's reputation for high quality cigars.  In *Spirits*, Moscow's renown[ed] reputation for vodka was not enough to affirm the TTAB's legal conclusion; likewise, Cuba's renown[ed] reputation for cigars is not enough in this case."  *Guantanamera*, 98 USPQ2d at 1083.  In *Spirits*, the Federal Circuit stated:

> The problem with the Board's decision is that it elsewhere rejected a requirement of proportionality, and discussed instead the fact that Russian is a "common, modern language[] of

> the world [that] will be spoken or understood by an appreciable number of U.S. consumers for the product or service at issue," such number being in this case 706,000 people, according to the 2000 Census. … The Board, however, failed to consider whether Russian speakers were a "substantial portion of the intended audience." Because the Board applied an incorrect test, a remand is required.

90 USPQ2d at 1496. The problem was with the Board's test regarding a foreign language mark, not with the nature or quantity of evidence submitted to establish materiality. Moreover, the Federal Circuit in *Spirits* did not disturb its holding in *California Innovations*, reiterated in *Les Halles de Paris,* 67 USPQ2d at 1542, that for goods, the PTO may raise an inference in favor of materiality with evidence that the place named in the mark is famous as a source of the goods at issue.

In view of the foregoing, we reject applicant's position that direct evidence of materiality is necessary to establish materiality. Indirect evidence may be used to establish materiality. We therefore determine that indirect evidence of materiality such as gazetteer entries and website evidence, and even expert testimony, may be submitted to establish materiality in an *inter partes* proceeding.

> *If an opposer may rely on indirect evidence of materiality, may opposer rely on such evidence in this case?*

31

Applicant argues that if it is permissible to draw an inference of materiality, an inference cannot be drawn in this case because the mark pertains to Guantanamo, and there is no evidence that Guantanamo is "famous or otherwise known" in the United States for cigar production; and the evidence shows that "Guantanamo is famous for a US Naval Detention center and as it relates to the song titled *Guantanamera*." Brief at 12-13. We do not accept this argument. First, the argument is inconsistent with the district court's findings that "Cuba or Guantanamo, Cuba is the primary significance of GUANTANAMERA," and that the consuming public is likely to believe from the misrepresentation in the mark that applicant's cigars originate from Cuba. *Guantanamera*, 98 at 1082. Second, applicant's argument ignores that we consider the issue in the context of the goods. *Corporacion Habanos*, 86 USPQ2d at 1478 ("the primary meaning of the term "Guantanamera" is "of or from Guantanamo, Cuba" or "a female from Guantanamo"; … those consumers of cigars in the United States who speak Spanish would know that Guantanamo is a geographic location and recognize the meaning of "Guantanamera" as "of or from Guantanamo, Cuba" or "a female from Guantanamo"; and … this would be the case especially in the context of applicant's goods."). Third, there is no requirement that the place identified in the mark must be "noted for" the goods for a

32

mark to be determined to be primarily geographically deceptively misdescriptive. See *In re Nantucket, Inc*., 677 F.2d 95, 213 USPQ 889, 898 (CCPA 1982) (Nies, J. concurring: "Neither this case nor any other cited by appellant provides authority for the principle that a place must be 'noted for' goods before use of its name as a mark will be held 'primarily geographically deceptively misdescriptive.'"). It is sufficient if the geographic connotation of the mark has significance for the goods, such that purchasers would expect the goods to have their origin in the identified locality. See *In re Jack's Hi-Grade Foods, Inc*., 226 USPQ 1028 (TTAB 1985), regarding the mark NEOPOLITAN for sausage made in the United States, where the Board stated:

> While there is no question but that sausage is not listed in the Gazeteer reference as one of the specific products which emanates from Naples, Italy, we see nothing … which require[s], as applicant contends, that a showing be made that the particular geographical area (Naples) is well known or noted for producing processed meat products and particularly sausage. On the contrary, the concurring opinion of Judge Nies in the case of *In re Nantucket*, [677 F.2d 95, 213 USPQ 889, 896-898 (CCPA 1982)] specifically rejected the "noted for" test. In the present case, evidence has been made of record which shows that "NEAPOLITAN" means pertaining to Naples, Italy; that Naples is a large city and seaport in Italy which serves as a major industrial and commercial center and which has a large food industry and that the specimen labels reinforce the "Italian connection" by virtue of the product is being described as Italian sausage as well as by a depiction of a simulated Italian flag immediately next to the word "NEAPOLITAN" on said specimen labels. It is our opinion that this evidence is sufficient to make out a prima facie

showing that purchasers of applicant's sausage would expect the goods to have their origin in the geographical locality named in the mark, that is, Naples, Italy.

Thus, because of the additional findings by the district court that (i) Cuba is well-known for cigars, and (ii) cigar tobacco is produced in Guantanamo, Cuba, *Guantanamera Cigar*, 98 at 1082, we need not require evidence that Guantanamo itself is famous or otherwise known in the United States for cigars or cigar tobacco.

> *Is the misrepresentation in the mark a material factor in a purchaser's decision to purchase the goods?*

The district court's findings included that the record "contains ample evidence that cigar tobacco is produced in the Guantanamo province" and that "Cuba is well-known for cigars." *Guantanamera,* 98 USPQ2d at 1082-83. However, the district court stated that *Spirits* "plainly demands more than a finding of Cuba's reputation for high quality cigars. In *Spirits*, Moscow's reputation for vodka was not enough to affirm the TTAB's legal conclusion; likewise, Cuba's renown[ed] reputation for cigars is not enough in this case." *Guantanamera*, 98 USPQ2d at 1083.

We turn next to the evidence submitted by the parties bearing on this issue, beginning with the advertisements for cigars in the record which make reference to Cuba or Cubans. We regard the advertisements as the best evidence of materiality in the record because they reflect those

34

features or elements of cigars that cigar merchants

emphasize, or those associations they want consumers to

make, in order to sell their cigars.  See, e.g.:

"La Aroma de Cuba – A taste from another time."
(TTABVUE no. 136 at 4);

"The Soul of a Cuban in a Dominican Cigar.  La
Gloria Cubana."  (TTABVUE no. 138 at 11);

"We deliver only the finest, handmade complex
cigars with the flavor of the Cuban heritage out
of which the recipe was born. … When Padron is on
the label, it's a matter of family honor."
(TTABVUE no. 136 at 15);

"No cigar, not even a Cuban, has ever been rated
higher."  [Onyx Reserve advertisement]  (TTABVUE
no. 136 at 17);

"C.A.O. Cigars … The Cigar That's Outscoring The
Cubans." (TTABVUE no. 136 at 20);

"In the golden age of Cuban cigars, Ramon
Cifuentes and his father made Partagas the
greatest of them all.  … Everything they know
about cigar making – growing the tobaccos,
harvesting and selecting the leaves, curing them,
aging them and then magically turning them into
great cigars one by one by hand – they learned
from Ramon.  Just as he learned it all from his
father long ago in Cuba."  (TTABVUE no. 137 at
11);

"Cameroon:  the Partagas difference.  … So make
your next cigar a Partagas.  And let the richest
of Cameroon wrappers and the richest of Cuban
traditions be yours."  (TTABVUE no. 138 at 3);

"When a cigar can make you forget about Havana.
That's One-Upmanship."  (TTABVUE no. 138 at 6);

"Cabanas® are now made with the extraordinary new
Habana 2000™ Tobacco.  (As if almost three
centuries of Cuban heritage weren't enough.)"
(TTABVUE no. 138 at 8);

"A lustrous Indonesian Vorstenlanden wrapper is artfully combined with the finest long-leaf filler tobaccos from the Dominican Republic, Brazil and Mexico.  A smooth and robust cigar made in the classic, time-honored Cuban tradition.  There hasn't been a cigar like this since 1959." [advertising Habano Primero] (TTABVUE no. 138 at 15);

"Capture the Spirit of Havana One Cigar at a Time."  [Xikar HC Series Cigars] (TTABVUE no. 139 at 3); and

"You no longer need to sacrifice flavor for strength.  The Savinelli Rico y Raro – Series Y cigar delivers both in one outstanding blend of Cuban seed, Nicaraguan grown long leaf filler and binder with a luscious Ecuadorian Habano wrapper." (TTABVUE no. 139 at 14.)

The advertisements suggest that Cuban cigar products are the standard against which certain merchants of non-Cuban cigars compare their products, and that these merchants seek to associate their products with Cuba in order to sell their products.  Mr. Armenteros, applicant's expert, agreed that those in the U.S. cigar industry try to connect their product with Cuba in some way because they think it will enhance the potential of their product in the market if consumers believe there is some association between their product and Cuba.[15]  (Armenteros dep. at 157; TTABVUE no. 123 at 107.)  He also noted that "Cuba is the birth place of cigars and any association with that adds

---

[15] As indicated earlier in our opinion, we did not consider the testimony of Mr. Armenteros as an expert, but we do consider his testimony on this subject on which he has knowledge, just as we would any other witness with relevant knowledge.

36

some sort of value."  (Armenteros dep. at 175; TTABVUE no. 123 at 109.)

We next consider Mr. Armenteros's blog entries at tobacconistuniversity.org/blog that refer to the quality of Cuban cigars and comment on the value that an association with Cuba has for cigars:

- As retail Tobacconists we see first-hand the amazing level of Romanticism in our consumers['] hearts and minds.  People ask us every day, "Do you have Cubans?", "Do you have Cohiba?" and when you ask them what their favorite cigar is, they often tell you it is a Cuban.  Often, mentioning a Cuban as your favorite cigar can be a psychological/egotistical badge of honor.

    ***

    These issues are convoluted by the U.S. trade embargo on Cuba and the unparalleled brand equity of "Cuban" cigars; there is no other luxury product in the world whose terroir is so revered, not even Bordeaux wines (Armenteros dep. exh. 15, TTABVUE no. 123 at 146-47);

- "Cuban seed myth, Cuban seed equals quality." (April 2008 posting) (Armenteros dep. exh. 17, TTABVUE no. 123 at 155);

- defining "Havana-Obsessed Consumers":

    Since Cuba is the "birthplace" of cigar tobacco, many consumers assume and continue to believe that Cuban cigars are the best in the world.  While this sentiment has changed dramatically since the 1990s, there are still many cigar smokers around the world that believe in Cuban cigar supremacy.  This bias/focus is further exasperated [sic] in the U.S. because Cuban products are not

    easily available to consumers, so they base their assumptions on romance and mythology.

37

(Armenteros dep. exh. 20; TTABVUE no. 123 at 158.)

Applicant maintains that Mr. Armenteros's postings and related testimony demonstrates that cigar manufacturers and merchants feature Cuban tobacco and Cuban connections to identify their heritage (as Cuban exiles) or to otherwise honor cigar making history. Brief at 2. Mr. Armenteros discusses this point at pp. 3-4 of his expert report (TTABVUE no. 133 at 4-5) (emphasis added):

> One of the major marketing trends to result from the emergence of the industry outside of Cuba has been the referencing and evocation of Cuba in cigar marketing. After all, Cuba is the "birthplace" of premium cigars and most, if not all, contemporary cigar seed varietals have evolved from Cuban varietals. This fact led to a very common marketing technique, which was the positioning and articulation of "Cuban Seed" on cigar boxes and brands. The term "Cuban Seed" has become less prevalent over the last decade [or] so as other references evocative of Cuba have become more common. Since the 1960s it has been a common technique to promote a Cuban connection with non-Cuban brands. Common references to Cuba, by non-Cuban brands, in cigar marketing include: Cuban Seed …, Made by Cubans … Habanos … Hecho A Mano, Cuban Made, and the use of the Cuban map …, among others. In addition, it is common for cigar brands and retail tobacconists to use Spanish words and references to Cuba when branding and marketing their products. In many ways, this is done to honor and evoke the traditions and techniques pioneered by the Cuban cigar industry.

Even if cigar merchants feature Cuban tobacco and Cuban connections to identify their heritage (as Cuban exiles) or to otherwise honor cigar-making history, ultimately they are promoting their goods to make a sale, and consequently are

highlighting characteristics of their cigars which will assist them in selling their cigars.  The Cuban references in the branding and marketing of their products are not simply for informational purposes or for reasons of pride.

We now consider the webpages from Cuban Crafters, the exclusive manufacturer and distributor of one of applicant's GUANTANAMERA cigar products, which sells non-Cuban cigars primarily via its website, and the testimony of Mr. Berger, the owner of Cuban Crafters.  One of Cuban Crafter's webpages states, "Buy Cuban Cigars Online at Cuban Crafters Online Store," followed immediately by "Cuban Cigars and cigar accessories at Cuban Crafters.  Buy typical Cuban cigars online where they are U.S.A. legal …."  The Cuban flag also appears on the webpage.  (Berger dep. at 3 - 4, 19, and 50-51, TTABVUE no. 123 at 5-6, 10 and 18-19; Berger dep. exh. 10, TTABVUE no. 123 at 33-34; Ossip supplemental report at 5 and at exh. A, TTABVUE no. 145 at 6 and 16.) Cuba is repeatedly emphasized on the webpages, despite the fact that the cigars offered are not Cuban in origin. Further, Mr. Berger testified, "people tell me that they purchased cigars, Cuban cigars, Guantanamera … and other names, Cohiba, that they purchased them through the Internet, and they've asked us why don't we carry them."[16]

---

[16] This testimony is considered not for its truth, but for what Mr. Berger recalls his consumers have asked him.  As such, it does not run afoul of the prohibition on hearsay testimony.

(Berger dep. at 41; TTABVUE no. 123 at 17.) Regarding Cuban cigars, he also acknowledged;

> I don't know if they're better, but there is an old saying, create fame and you can fall asleep. In other words, fame itself leads you on. All over the world people always have the fame of the Cuban rum and the Cuban cigar.

(Berger at 40; TTABVUE no. 145 at 16.) This evidence further suggests that a branding association with Cuba indeed does "give some sort of value," as Mr. Armenteros stated at p. 175 of his deposition. (TTABVUE no. 123 at 175.)

The record also contains articles from various magazines, cigar publications and cigar encyclopedias which reflect that the cigar consumer values Cuban tobacco and cigars. We agree with opposer that the following excerpts from articles submitted with Mr. Ossip's supplemental expert report (TTABVUE no. 145) "powerfully reinforce the admissions of GCC's [applicant's] own witnesses that U.S. cigar consumers desire and purchase cigars based on their often mistaken belief that the cigars are of Cuban origin" (opposer's brief at 6):

● The "Ultimate Counterfeit Cuban Cigar Primer," by Steve Saka, March 22, 2002 (taken from cigarnexus.com/counsel/counterfeit):

> "Cuban cigars are regarded as one of life's most indulgent luxuries. … They are highly sought after by both the aficionado and the novice …. Probably the biggest factor working in the counterfeiter['s] favor is consumer ignorance. … This lack of education has helped many

40

unscrupulous lowlifes prey on our lack of knowledge as the means to lining their pockets with our hard-earned money." (TTABVUE no. 145 at 25-26.)

● "Cuban Cigars JFK Loved May End 'Forbidden Fruit' Status in U.S.," by Mark Drajem - June 17, 2009 (taken from bloomberg.com):

Cuban cigars … hold cachet in popular culture that dates back to the island's days as playground for gamblers, novelists and mobsters. …

"A Cuban embodies so much more than smoke," said James Suckling, who has written articles on Cuba for *Cigar Aficionado* magazine. He estimates Americans consume about 20 million Cuban cigars a year, enjoying them while traveling to Mexico or the Caribbean or stowing them in luggage on the way home. …

"Cuban cigars are legendary," said owner Bob Materazzi. "Anybody who is a cigar geek is interested." (TTABVUE no. 145 at 28-29.)

● *Smoke,* "Spotting Fake Cuban Cigars," Spring 1998:

It is unfortunate that a guide like this is necessary, but to protect the good reputation of Cuban tobacco, we must attempt to make it difficult for those who seek to fool us with inferior products. …

The fake-cigar scenario is more common than ever these days, with so many new smokers looking for Cuban cigars. (TTABVUE no. 140 at 33-34.)

● *Cigar Aficionado,* "Counterfeit Cubans, South of the Border," May 1, 2000, (taken from cigaraficianado.com):

Two million to three million fake Cubans a year are in the Mexican market, "and the majority usually find their way into the United States." (TTABVUE no. 145 at 35.)

● *Cigar Aficionado,* "Florida Shuts Down Counterfeit Cigar Ring," Nov. 23, 2009 (taken from cigaraficionado.com):

The organization is accused of mass-producing counterfeit Cuban cigars …. [T]he organization

> would re-label and repackage inexpensive cigars with the expensive bands, markings and boxes synonymous with popular Cuban cigar brands. (TTABVUE no. 145 at 36.)

● *Slate,* "Arnold's Contraband: If the Governator Doesn't Countenance Civil Disobedience, What's With the Cuban Cigars?" February 27, 2004 (taken from slate.com):

> But Schwarzenegger does not reject civil disobedience in all conceivable situations. When something *really important* is at stake, the Governator will defy the law to heed the dictates of his conscience. … We speak here of Schwarzenegger's private stash of Cuban cigars. (TTABVUE no. 145 at 37-8.)

From the advertisements, webpages, testimony, magazines and cigar publications and encyclopedias, we find that opposer has established that sellers of cigars in the United States market non-Cuban cigars through branding and marketing associations with Cuba because they believe that consumers value associations with Cuba in making purchasing decisions.[17] Because, as we have already found, a substantial portion of the relevant consumers speak or understand Spanish, we find that such consumers would be materially influenced in the decision to purchase applicant's cigars due to the geographic meaning of the mark in the Spanish language. *Spirits,* 90 USPQ2d at 1495.

We would be remiss if we did not comment on one additional point raised by applicant, namely, that "[c]igar

_____

[17] However, in light of the district court's instruction on the subject, we have not, in the remand of this case, relied on applicant's false claim that its goods include "Genuine Cuban Tobacco."

consumers are some of the most sophisticated purchasers of any product," brief at 9, and hence that they "would not be confused or deceived as to the origin of Applicant's cigars bearing the GUANTANAMERA trademark, nor would any possible suggestion with Guantanamo (or even Cuba) be material to their purchasing decisions." While there are likely some consumers such as Mr. Armenteros who would "not be confused or deceived as to the origin of Applicant's cigars bearing the GUANTANAMERA trademark," there is no evidence as to what portion of potential purchasers has this level of sophistication. Thus, applicant's argument is not well-taken.

*Conclusion*

Opposer has provided ample evidence establishing that a significant portion of consumers of cigars would be materially influenced in the decision to purchase cigars by the geographic meaning of applicant's mark. Because opposer has established the other elements of the test for a primarily geographically deceptively misdescriptive mark, we sustain the opposition on the ground of Section 2(e)(3) of the Trademark Act, 15 U.S.C. § 1052(e)(3). And, because we have sustained the opposition on this ground, we again do not reach opposer's pleaded claim of fraud.

43